Argued June 22; reversed November 3; petition for rehearing
denied November 30, 1948

## JENKINS *v.* JENKINS
198 P. (2d) 985

*Thomas C: Hartfiel,* of Roseburg, argued the cause
and filed a brief for appellant.

*George Luoma,* of Roseburg, argued the cause and filed a brief for respondent.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and HAY, Justices.

ROSSMAN, C..J.

This is an appeal by Elmer Thomas Jenkins, father of Eldine Jenkins, a minor, from an order of the circuit court entered September 20, 1947, which modified the provisions of a decree of divorce concerning the custody of Eldine. The defendant-respondent is the mother of the child. The latter was born July 3, 1938. The decree which was entered March 29, 1943, awarded Eldine's custody to the father and granted the mother the right to visit at reasonable times. The attacked order awarded the custody to the mother but granted the father the right of visitation. The decree of divorce was entered upon the defendant's default, and was based upon a complaint which averred cruel and inhuman treatment.

The motion to modify presented the following propositions: (1) the defendant has remarried; (2) the plaintiff has remarried; (3) the defendant is the proper person to have the custody of Eldine and now possesses a home; (4) "the default divorce decree obtained by the plaintiff in the above-entitled suit was obtained

through fraud and deceit practiced by the plaintiff upon the defendant''; and (5) in August, 1942, the defendant left the plaintiff ''for her own protection and good interests as well as that of their minor child'' and prior to her departure the parties had ''mutually agreed * * * that as soon as defendant became settled in California and could provide a home for herself and her minor child that defendant would then have the care and custody of their minor child.''

We shall first consider the charge that the decree of divorce resulted from fraud practiced by the plaintiff upon the defendant. Notwithstanding the fact that the motion upon which the attacked order is based, charges that the divorce decree ''was obtained through fraud and deceit,'' there appears to be no claim that the charges of cruelty which were averred in the complaint and which were found by the findings of fact to be true, were, in fact, false. The findings of fact, when epitomized, found that the defendant was guilty of cruelty in the following particulars: violent temper; nagging and fault-finding disposition; ''every year since the marriage of plaintiff and defendant, without any cause for so doing, the defendant has left the plaintiff and their home and has remained away for from one to six months''; unwarranted ''dissatisfaction with their home and with plaintiff's occupation''; an unwillingness to make a permanent home with plaintiff; an announcement by the defendant in August, 1942, that ''she had lost all of her love and affection for plaintiff; that she was leaving him and was not coming back''; and in August, 1942, ''defendant packed all her belongings and went to California, leaving the plaintiff and his daughter in their home at Sutherlin, Oregon.'' The charge of deceit apparently is not that

those charges were untrue, but only that the defendant was induced by fraud, practiced by the plaintiff, to refrain from applying for the custody of the child.

The parents, prior to the divorce, made their home in or near Sutherlin. One of the circumstances which made for domestic discord was the fact that the defendant annually left the home and stayed away for extended periods. Shortly prior to the institution of the suit for divorce the defendant was engaged in packing her belongings preparatory to another departure. When the plaintiff noticed what she was doing he told her that if she went he would seek a divorce. The defendant adhered to her plan, departed from her home, left Eldine behind and went to reside with a sister in Los Angeles. Two months later, that is, October 23, 1942, the complaint in the divorce suit was filed and in the following month the defendant was served with the complaint and summons. The prayer asked that the custody of Eldine be awarded to the plaintiff. The defendant at once returned to Sutherlin. March 29, 1943, the decree of divorce was entered.

Upon the hearing concerning the custody of Eldine which occurred after the defendant had filed the motion now under consideration for a modification of the decree, the defendant swore that before she left home in August, 1942, she effected an agreement with the plaintiff that ''I should leave her there until I was settled and had somebody to help me take care of her. * * * I was to leave her there and come back for her as soon as I got settled and had a home and job.'' She also testified that when she returned home after having been served she spoke to the plaintiff about the suit and was told that she need not employ an attorney,

that he did not intend to continue with the suit and that she could have the custody of their daughter if she wanted it. She added that the plaintiff expressed a preference for divided custody. Eldine was four years of age when the suit for divorce was filed.

The plaintiff denied that he made any of the statements and promises attributed to him by the defendant. He swore that when the defendant returned to Sutherlin her principal concern was about the divorce and that she made little mention of Eldine and of her custody. He testified that the defendant urged that the divorce be granted to her, but that he replied he intended to get the divorce for himself as soon as he could procure the money necessary to discharge expenses. It will be recalled that the complaint was filed October 23, 1942, and that no decree was entered until March 29, 1943. Thus an interval of five months passed before the decree was rendered. The plaintiff accounted for the delay by swearing that he lacked money with which to prosecute the suit, and his attorney calls attention to the intervals that elapse between terms of court in Douglas County. The defendant conceded that she was in Sutherlin from the time she returned in November to and including March 29, 1943, when the decree was entered. In fact, referring to the entry of the decree, she testified: "I stayed around there for a month or so and worked." It was not until the "month or so" had passed that she left Sutherlin. Thus approximately half a year intervened between the defendant's return to Sutherlin and her departure after the entry of the decree. Before the defendant left Sutherlin for her return to Los Angeles she did not apply to the court for a modification of the decree, nor did she request the plaintiff to permit her to take

Eldine with her. It is clear that the defendant knew before she left Sutherlin that custody of Eldine had been awarded to the plaintiff. The defendant's own words were: "He said I had no chance, I lost it when I did not contest the divorce." The statement by the plaintiff to which the quoted words refer was made to the defendant before she left Sutherlin.

About the time that Eldine was nearing the age for entry into grammar school, the plaintiff wrote the defendant a letter in which he asked her to return to Sutherlin and take care of Eldine. The letter agreed to pay the defendant for her services. As a result of the offer, the defendant came to Sutherlin. She testified: "When I got here he asked me to stay and make a new home for her." The defendant agreed to do so. She took care of Eldine for a year. The plaintiff paid her for her work. In that period the defendant did not apply to the court for a vacation of the decree of divorce nor for a modification of the part which granted the custody of Eldine to the plaintiff.

August 11, 1945, the defendant was married to Clarence H. Bratton. January 25, 1947, the motion now under consideration was filed. Eldine was then eight and one-half years of age. It is conceded that the motion then filed was the first effort made by the defendant to gain custody of the child.

The defendant swore that when the decree of divorce was entered March 29, 1943, she did not consider the plaintiff a fit and proper person to be awarded the custody of Eldine. As we have seen, she did not apply for custody until January 25, 1947. Section 1-1007, O. C. L. A., permits a party to be relieved from an order, decree or judgment "taken against him through his mistake, inadvertence, surprise or ex-

cusable neglect,'' if he applies for such relief within one year after becoming apprised of the entry of the jural paper. Although the defendant claims that the plaintiff deceived her, and although the brief of her counsel frequently terms the decree of divorce a ''surprise divorce'', the defendant nowhere explains why she never sought the vacation of the divorce decree. She, however, swore that she did not apply sooner for Eldine's custody because she lacked a home. If her present home is the result of her present marriage, then she permitted virtually a year and a half to pass after she acquired a home before filing the motion now under consideration.

■ We have examined with care the testimony given in support of the defendant's claim that the plaintiff deceived her and that she therefore refrained from asking for the custody of Eldine. A party who charges fraud must sustain the burden of proof. A presumption faces him that the transaction was regular and free from fraudulent representations. By reverting to the language which we quoted from the motion, it will be observed that the defendant therein accounted for her departure from the family home in August, 1942, by claiming that she left ''for her own protection and good interests as well as that of their minor child.'' As a witness, she swore that before she went ''it was just little things, kept piling up, there was no special thing at the time I left.'' Ferreting out the cause of domestic discord is sufficiently difficult without being aggravated by false charges. If the plaintiff practiced the deceit attributed to him by the defendant, the latter permitted more than four years to pass before she asked the courts to relieve her from the alleged iniquitous order and to remove as the cus-

todian of her daughter the plaintiff, who she claims is unfit. The sole explanation which the defendant gave for her long delay is that she lacked a home. But the court, upon awarding her custody of Eldine, had ample power to compel the father to make needed contributions; in fact, the order now under consideration requires the plaintiff to pay for Eldine's support. The motion, upon which the order is based, did not even ask for support money. Moreover, it is remarkable what miracles mother love can work in creating a home; adversity and even poverty are never insurmountable barriers.

■ We do not believe that the plaintiff made false representations to the defendant and thereby induced her to refrain from contesting any issue in the suit for a divorce. We dismiss the charge of deceit as unsupported by the evidence.

We come now to the problem as to whether the circuit court erred when it sustained the defendant's motion and awarded Eldine's custody to the defendant. We shall now review the evidence upon this phase of the case.

As we have seen, the defendant left the plaintiff and Eldine in August, 1942, and departed for Los Angeles. Although an affidavit of the defendant which accompanied the motion for modification states that the defendant left the home "for her own protection," the evidence, as we have seen, fails to sustain that charge. We think that this element of the case is important. One would scarcely expect a mother to depart and leave behind a child of tender years, in the absence of an impelling reason. We have mentioned the fact that the mother swore that she did not deem the father a fit and proper person to have the custody of Eldine.

As a witness, the defendant, far from claiming that she departed for her own protection, testified that "just little things, * * * no special thing" had taken place before she quit her home, her husband and her child. In other words, it is untrue that she departed for her own protection. She had no urgent reason for going.

The plaintiff was the operator of a logging truck and had no special facilities for discharging the double duty of mother and father which devolved upon him when his wife left in his custody their four-year-old daughter. The wife's own words were: "Well, I didn't have anybody to take care of her any more than he did." Confronted with this difficult and delicate problem, he summoned his mother who lived in Cottage Grove. According to the defendant's testimony, "He had his mother part of the time. Hired help the rest of the time." In that way the plaintiff dealt with the problem which the defendant's departure had thrust upon him. According to her admission, "He did the best he knew how." Evidently his task was not a simple one, for we observe in the record that at one time he noticed that Eldine had become afflicted with the measles. The attack of measles was only one of the incidents which shows that from the time the little girl was four years of age, the plaintiff was both mother and father to her.

We mentioned the fact that after the defendant was served with the complaint and summons she returned to Sutherlin and remained there about six months. In that period the plaintiff had the custody of Eldine and cared for her wants, except for an occasional day or so when the defendant took charge of her. The defendant's only reference to the attention which she

gave to Eldine in this six months period was the following:

"Q. Did you take care of Eldine?

"A. Only when she came to stay with me, she went to town with me occasionally, and would stay overnight with me."

We mentioned the five-month period preceding the divorce for the purpose of showing that even before the entry of the decree it was the father, and not the mother, who cared for their child. We also mentioned the fact that as Eldine was nearing school age the plaintiff appealed to the defendant to return to Sutherlin and help him care for their daughter. The plaintiff explained his appeal by saying that at that time she "was working for wages, and I had to hire somebody." The defendant came to Sutherlin and remained while Eldine went through her first year at school. The evidence shows that she took good care of her daughter. The latter proved to be a good pupil and her teacher commented upon her neat appearance. She was absent from school five days. At the end of the school year the defendant quit the employment.

August 6, 1945, when Eldine was seven years and one month of age, the plaintiff remarried. Five days later the defendant remarried. Thus when Eldine began her second grade in school she had a stepmother. Eldine's report card covering the second grade is before us. It shows that she was absent from school six days and that she received good grades. The evidence indicates that her school work was better than average. The report card used in her school contains a printed enumeration of twelve factors concerning the pupils, including the following: "Good physical condition"; "Regular attendance"; "Attentive, quiet and

orderly"; "Is courteous"; "Has pride in school and personal appearance". Opposite each of the twelve factors are favorable marks on Eldine's card.

While Eldine was in the third grade she was not absent from school for even a single day. Her school employed for the pupils in the third grade report cards upon which the teacher wrote personal observations concerning the pupils' progress. All of the notations upon Eldine's card concerning her are good. The first, dated November 7, 1946, reads as follows: "Eldene does very well in school. She is unusually quick in getting her lessons finished." The fifth notation, written April 30, 1947, said: "Eldene is definitely in the upper brackets of the room now. She does her work quickly and thoroughly." June 6, 1947, being the last of the notations, reads: "Eldene has shown unusual progress this year. Her untiring efforts have brought about very satisfactory results."

If the report cards are a reliable indication of the care which her father gave her, the plaintiff has been a good father to his daughter.

The defendant became a mother by her present husband March 20, 1946. The plaintiff became a father by his present wife some time later. His present wife had a boy, four years old, by a previous marriage. Thus if Eldine remains in her father's custody she will be in a home with two other children, both younger than herself. If the attached order is affirmed, she will be in a home with one other child, likewise younger than herself.

No one questions the plaintiff's good moral character, his industry or sobriety. He owns the home in which he lives and is also the owner of four logging

trucks which he operates in his business. The plaintiff testified:

"Q. Has your present wife been taking care or assisting you in taking care of her (Eldine) since your remarriage?

"A. Yes, she has.

"Q. Will you state whether or not she gets along well with the youngster?

"A. She seems to get along O. K.

"Q. Does the child appear to be happy and contented in her present environment?

"A. So far as I can see."

From the testimony given by the plaintiff's present wife, we quote:

"Q. Will you state whether or not since your marriage you have been taking care of his daughter Eldine?

"A. I have.

"Q. And how many others are there in the family?

"A. Two children.

"Q. And is the home life there with the children harmonious?

"A. It seems to be. I try to make it that way.

"Q. Will you state whether or not you treat the little girl as if she were your own daughter?

"A. I do.

"Q. You have tried at all times to keep her happy and contented?

"A. Yes, sir.

"Q. Is she in good health at the present time?

"A. I believe she is in better health now than when I first took her. She seems to be in good health.

\* \* \*

"Q. Could you provide her with the love and affection that you think any child of that age should have?

"A. I try to.

"Q. You have seen she has attended school since you had her?

"A. Yes, on several occasions I have called at the school in regard to her school work there."

From the memorandum opinion prepared by the trial judge, we quote:

"The evidence further shows that the defendant is happily married and is a person of good moral character and is a fit and proper person to have custody of her child."

The record does not disclose the occupation or financial worth of the mother's present husband. It describes their home as neat and clean, but neither its location nor its ownership was mentioned by any witness.

The plaintiff swore that he never denied the defendant the privilege of visiting Eldine nor of taking the child to her (defendant's) home at any time she wished. The defendant herself testified: "He has never said I could not." The plaintiff's present wife testified that she personally invited the defendant to come to her home and visit Eldine there or take her to some other place. The defendant came only once.

The evidence indicates that Eldine is happy when she is in her mother's company, but we know of no reason for inferring that she does not find her father a good companion. The evidence also indicates that she is a nervous, sensitive child and that after she discovered that proceedings had been instituted which centered around her custody, she became greatly disturbed. She did not testify.

The above, although it omits details, is, we believe, a fair review of the evidence.

As is usual in proceedings concerning the custody of a child, the briefs dwell upon the common norms which aid courts in determining which parent shoud be given custody. The plaintiff urges the rule that a change in custody should be made only when there has been a change in conditions. He cites the statutory mandate that preference should be given to the parent who was found to be without fault. The mother stresses the rule that the custody of a child of tender years, especially if a girl, should be awarded to the mother, unless she is grossly immoral or subjects the child to abuse.

■ Family life presents so many facets that it is the determination of the facts, rather than the application of the rules, which confronts the court with its most perplexing difficulty in custody cases. The memorandum opinion of the trial judge says:

"The evidence further shows that the defendant is happily married and is a person of good moral character and is a fit and proper person to have custody of her child. It is my belief that a girl of that age needs the attention of her mother."

We, too, believe that normally a girl of Eldine's age should be awarded to her mother if the latter is of good moral character and has shown interest in her child.

We are impressed with the wisdom found in the utterance, "Simply having children does not make mothers." (Shedd, Salt From My Attic). The record falls short of indicating that the defendant's affection for Eldine has been constant and deep-rooted. She twice, at least, quit her daughter for the purpose of

serving her own ends: (a) when she left her home in August, 1942, and went to reside in Los Angeles; and (b) when she ceased caring for Eldine in the summer of 1945, seemingly for the purpose of marrying her present husband. A parent, it appears to us, should manifest stability and a sense of responsibility. We are impressed with the record of stability, resourcefulness and responsibility which the plaintiff has made in the six years in which he has been charged with his daughter's welfare. The mother must have discerned in him a deep-seated interest in the child when she departed from the home six years ago. Her judgment, if such it was, has been vindicated.

■ Our paramount duty is to award the custody of this child to the parent who will best serve its interests. So far, at least, the father has been a faithful custodian. Since he has had her care the girl has grown from the age of four to that of ten; she has done better than average in school; her health is reported to be entirely satisfactory. It is evident that he has made no effort whatever to turn Eldine against her mother, and that, to the contrary, he is anxious that the mother should visit Eldine frequently. He owns his home and appears . to be in good financial condition. We know of nothing about his conduct, as the latter is reflected by the record, which warrants censure or his removal as custodian. To the contrary, he appears to be entitled to commendation. His present wife seems to have the right attitude toward Eldine and her mother.

Although the defendant's marriage to Mr. Bratton, as described by the record, seems to be a happy one, we know nothing about Mr. Bratton. His age, past, occupation, stability and financial worth are unknown to us. We do not even know whether or not he has ever

seen Eldine. To take this sensitive child and place her in the home of a stepfather, who is virtually a stranger to the record, might bring in its wake many unhappy experiences for the child.

██ We do not know that Eldine will do better if we take her from her faithful father and give her to her mother. We cast no aspersion upon the mother. But, in this proceeding, she has the burden of proving that a change in custody will be for Eldine's best interest. In our opinion, she has not discharged the burden.

The order of the circuit court is reversed and vacated. Costs and disbursements will be awarded to neither party.